NR:RCH/EMR
F. #2017R01784

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE FACEBOOK ACCOUNT ASSOCIATED WITH FACEBOOK USERNAME "LUBA FRANCO" LOCATED AT URL: WWW.FACEBOOK.COM/LUBA.BEYLINA THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC | **APPLICATION FOR A SEARCH WARRANT FOR INFORMATION IN POSSESSION OF A PROVIDER (FACEBOOK ACCOUNT)**<br><br>Case No. 18-M-1010 |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

MAEGAN REES, being duly sworn, deposes and states that she is a Special Agent with the

Federal Bureau of Investigation, duly appointed according to law and acting as such.

1.      I make this affidavit in support of an application for a search warrant for

information associated with the Facebook Account associated with Facebook Username LUBA

FRANCO, located at URL: www.facebook.com/luba.beylina (the "SUBJECT FACEBOOK

ACCOUNT") that is stored at premises owned, maintained, controlled, or operated by Facebook

Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The

information to be searched is described in the following paragraphs and in Attachment A. This

affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a),

2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and

other information in its possession, pertaining to the subscribers or customers associated with the

user IDs.

2.      I have been a Special Agent with the Federal Bureau of Investigation ("FBI") for

over one year. During my tenure with the FBI, I have participated in investigations involving,

among other things, fraud and financial crimes. I have also conducted interviews, made arrests, executed search warrants, and secured other relevant information using a variety of investigative techniques. I am familiar with the facts and circumstances set forth below from my participation in the investigation; my review of the investigative file; my communication with other law enforcement officers; my review of reports of other law enforcement officers involved in the investigation; and my review of other records associated with the investigation.

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     Based on my training and experience, there is probable cause to believe that LYUBOV BEYLINA has committed violations of federal criminal law, including Theft Concerning Programs Receiving Federal Funds, in violation of 18 U.S.C. Section 666(a)(1)(A), and Health Care Fraud, in violation of 18 U.S.C. Section 1347 (the "SUBJECT OFFENSES"). There is also probable cause to search the SUBJECT FACEBOOK ACCOUNT described in Attachment A for evidence, instrumentalities, contraband and/or fruits of these crimes further described in Attachment B.

## PROBABLE CAUSE

5.     On October 2, 2018, the Honorable Vera M. Scanlon, United States Magistrate Judge for the Eastern District of New York, signed a complaint and issued an arrest warrant authorizing the arrest of LYUBOV BEYLINA ("BEYLINA") as well as seven other individuals. See United States v. Doyle et al., 18 MJ 927 (the "Complaint"). The Complaint is attached hereto as Exhibit A and incorporated herein by reference.

2

6.    As set forth in the Complaint, the FBI and the New York City Department of Investigation ("DOI") have been conducting an investigation into allegations of fraudulent billing practices in connection with the New York State Early Intervention Program (the "EIP"), a program that provides remedial services to developmentally delayed children from birth to age three. Such services may include physical, occupational, and speech therapy; special instruction; and social work services. These services are provided by individual therapists who are either subcontractors or employees of agencies that hold EIP contracts with the New York State Department of Health ("NYS DOH"). NYC DOHMH administers the EIP in New York City and conducts audit, quality assurance, and compliance oversight of the EIP, under the ultimate oversight of NYS DOH.

7.    In order to receive payment for an EIP therapy session, a therapist must provide a written report, known as a session note, documenting his or her session with a child. Sessions generally occur in half-hour or one-hour increments. These session notes detail the date, time and place of the session as well as some details of the therapy given and the child's progress in response to the treatment. Session notes must be signed by the therapist and the parent or guardian of the child immediately after the EIP therapy session ends.

8.    As set forth in the Complaint, during the course of this investigation, law enforcement officers determined that BEYLINA, an EIP therapist, had submitted numerous fraudulent session notes and invoices for non-existent EIP sessions purportedly occurring in the Eastern District of New York and elsewhere. Specifically, law enforcement officers determined that, between approximately August 2012 and January 2017, BEYLINA submitted fraudulent session notes and invoices and received payment for more than 600 non-existent EIP sessions,

3

resulting in the improper disbursement of more than $24,000 in Medicaid funds and more than $17,000 in NYC DOHMH funds. For example:

    a. Law enforcement officers reviewed toll records for BEYLINA's cellular telephone, which they identified as BEYLINA's cellular telephone based on, among other things, EIP employment records, and determined that on at least 300 occasions BEYLINA was using her cellular telephone during at least a quarter of the time period that she claimed to be performing an EIP therapy session.

    b. Law enforcement officers also interviewed the parents, guardians, teachers and daycare providers of children to whom BEYLINA claimed to provide EIP therapy sessions. Law enforcement officers identified at least 100 occasions in which BEYLINA claimed to perform an EIP therapy session and submitted an EIP session note containing a signature that the parent, guardian, teacher or daycare provider stated was, in fact, a forgery or for a session that did not occur. In addition, law enforcement officers also reviewed text message correspondence between BEYLINA and certain parents, guardians, teachers and daycare providers and identified at least 180 occasions in which BEYLINA submitted an invoice for an EIP therapy session that, as reflected in the text message correspondence, never occurred.

    c. Law enforcement officers also reviewed travel records for several airlines and determined that, on at least 80 occasions, BEYLINA submitted fraudulent EIP invoices for therapy sessions that purportedly occurred when BEYLINA was, in fact, either outside of New York or in air transit. For example, BEYLINA submitted 51 invoices for EIP therapy sessions purportedly occurring between June 28, 2016 and July 5, 2016, when BEYLINA was, in fact, in the Dominican Republic.

4

d. Finally, law enforcement officers reviewed historical location data for BEYLINA's cellular telephone. Law enforcement officers compared the historical location data to the EIP session notes submitted by BEYLINA and determined that BEYLINA, on numerous occasions, was not present in the vicinity of the EIP therapy session location at the time of the purported EIP therapy session.

9.       During the investigation, law enforcement officers searched Facebook for BEYLINA's name and located the SUBJECT FACEBOOK ACCOUNT. Law enforcement officers visited the public page of the SUBJECT FACEBOOK ACCOUNT and recognized the individual in the profile picture to be BEYLINA from her photograph on file with the New York State Department of Motor Vehicles. Law enforcement officers also observed that the SUBJECT FACEBOOK ACCOUNT's vanity name, "Luba Franco," contains the same last name as BEYLINA's married name, which officers recognized from BEYLINA's marriage license and other publicly-filed documents.

10.      Law enforcement officers also observed evidence of the SUBJECT OFFENSES contained within the SUBJECT FACEBOOK ACCOUNT. For example, as described above and in the Complaint, in June and July 2016, BEYLINA submitted 51 invoices for EIP therapy sessions that purportedly occurred when she was, in fact, in the Dominican Republic. Law enforcement agents observed that the user of the SUBJECT FACEBOOK ACCOUNT posted an entire album of photographs documenting that trip, including numerous photographs of BEYLINA in the Dominican Republic during times for which she had also submitted fraudulent invoices for EIP sessions. One of those photographs was attached to the Complaint as Exhibit A.

11.      Similarly, in or about 2015, BEYLINA submitted invoices for EIP therapy sessions purportedly occurring when she was, in fact, in Mexico. Law enforcement agents observed that

5

the user of the SUBJECT FACEBOOK ACCOUNT posted an entire album of photographs documenting that trip, including numerous photographs of BEYLINA in Mexico during times for which she had also submitted fraudulent invoices for EIP sessions.

12.     On or about October 11, 2017, and June 29, 2018, the government submitted preservation requests to Facebook, requesting that Facebook preserve any and all information in its possession associated with the SUBJECT FACEBOOK ACCOUNT.

## TECHNICAL INFORMATION ABOUT FACEBOOK

13.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

14.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

15.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account

6

includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

16.    Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

17.    Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

18.    Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the

7

photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

19.     Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

20.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

21.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

22.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

23.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through

8

the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

24. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

25. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

26. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

27. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

28. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings;

9

rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

29.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

30.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

31.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution"

10

evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

32. Based on the information above and the fact that preservation requests have been filed for the SUBJECT FACEBOOK ACCOUNT, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information

11

concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

33.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

34.     *Manner of execution.*  Because this warrant seeks only permission to obtain information from a provider and then examine that information once it is already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is good cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

35.     Based on the forgoing, I request that the Court issue the proposed search warrant.

36.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that - has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).

37.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

12

WHEREFORE, your deponent respectfully requests that a search warrant be issued

for Facebook Account associated with Facebook Username LUBA FRANCO, located at URL:

www.facebook.com/luba.beylina (the "SUBJECT FACEBOOK ACCOUNT") as further described

in Attachment A, to search for and seize the items listed in Attachment B as evidence and

instrumentalities of violations of Title 18, United States Code, Sections 666(a)(1)(A) and 1347.

Respectfully submitted,

MAEGAN REES
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on October 19, 2018

s/ Cheryl Pollak

THE HONORABLE CI
UNITED STATES MA
EASTERN DISTRICT

13

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Facebook Account associated with Facebook Username LUBA FRANCO, located at URL: www.facebook.com/luba.beylina (the "SUBJECT FACEBOOK ACCOUNT") that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California.

## ATTACHMENT B

### Particular Things to be Seized

**I.     Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)     All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers;

(b)     All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c)     All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them;

(d)     All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments;

gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f)     All "check ins" and other location information;

(g)     All IP logs, including all records of the IP addresses that logged into the account;

(h)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(i)     All information about the Facebook pages that the account is or was a "fan" of;

(j)     All past and present lists of friends created by the account;

(k)     All records of Facebook searches performed by the account;

(l)     All information about the user's access and use of Facebook Marketplace;

(m)     The types of service utilized by the user;

(n)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account; and

(p)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

2

**II.     Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and

instrumentalities of violations of all information described above in Section I that constitutes

fruits, contraband, evidence and instrumentalities of violations of Title 18, United States Code,

Sections 666(a)(1)(A) and 1347, which involve LYUBOV BEYLINA between August 2012 and

January 2017, including, for each user ID identified on Attachment A, information pertaining to

the following matters:

(a) Evidence indicating how and when the Facebook account was accessed or used,
to determine the chronological and geographic context of account access, use, and
events relating to the crime under investigation and to the Facebook account
owner;

(b) Evidence indicating the Facebook account owner's state of mind as it relates to
the crime under investigation;

(c) The identity of the person(s) who created or used the user ID, including records
that help reveal the whereabouts of such person(s); and

(d) The identity of the person(s) who communicated with the user ID about matters
relating to violations of Title 18, United States Code, Sections 666(a)(1)(A) and
1347, including records that help reveal their whereabouts.

3

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct. I am employed by Facebook, and my official title is _____. I am a custodian of records for Facebook. I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of Facebook, and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

a.     all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

b.     such records were kept in the ordinary course of a regularly conducted business activity of Facebook; and

c.     such records were made by Facebook as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.


_____          _____
Date                             Signature

# EXHIBIT A

NR:RCH/EMR
F. #2017R01784

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------- X

UNITED STATES OF AMERICA

- against -

KADERRAH DOYLE,
CARA STEINBERG,
MARINA GOLFO,
EGO ONAGA,
LYUBOV BEYLINA,
DANIELLE SCOPINICH,
PATRICIA HAKIM, and
ENOCK MENSAH,

Defendants.

--------------------------- X

**TO BE FILED UNDER SEAL**

AFFIDAVIT AND COMPLAINT IN
SUPPORT OF APPLICATION
FOR ARREST WARRANT

(18 U.S.C. §§ 666(a)(1)(A) and 1347(a))

18-MJ-927

EASTERN DISTRICT OF NEW YORK, SS:

MELISSA GALICIA, being duly sworn, deposes and states that she is a Special

Agent with the Federal Bureau of Investigation, duly appointed according to law and acting as

such.

In or about and between August 1, 2012 and April 30, 2018, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants KADERRAH DOYLE ("DOYLE"), CARA STEINBERG ("STEINBERG"),

MARINA GOLFO ("GOLFO"), EGO ONAGA ("ONAGA"), LYUBOV BEYLINA

("BEYLINA"), DANIELLE SCOPINICH ("SCOPINICH"), PATRICIA HAKIM

("HAKIM") and ENOCK MENSAH ("MENSAH"), (collectively, "the defendants"): (i) being

agents of an agency of a local government, to wit: the New York City Department of Health

and Mental Hygiene (the "NYC DOHMH"), did knowingly and intentionally embezzle, steal,

obtain by fraud, or otherwise without authority knowingly convert to the use of a person other

than the rightful owner, property that is valued at $5,000 or more and is owned by, or is under

the care, custody, or control of the NYC DOHMH, an organization that received benefits in

excess of $10,000 under one or more Federal programs involving grants, contracts, subsidies,

loans, guarantees, insurance and other forms of Federal assistance in one or more one-year

periods; and (ii) did knowingly and willfully execute and attempt to execute a scheme and

artifice to defraud a health care benefit program, to wit: Medicaid, and to obtain, by means of

materially false and fraudulent pretenses, representations and promises, money and property

owned by and under the custody and control of said health care benefit program in connection

with the delivery of and payment for health care benefits and services.

(Title 18, United States Code, Section 666(a)(1)(A) and 1347(a))

The source of your deponent's information and the grounds for her belief are as

follows:[1]

1. I have been a Special Agent with the Federal Bureau of Investigation

("FBI") for over three years. During my tenure with the FBI, I have participated in

investigations involving, among other things, fraud and financial crimes. I have also conducted

interviews, made arrests, executed search warrants, and secured other relevant information

using a variety of investigative techniques. I am familiar with the facts and circumstances set

---

[1]    Because the purpose of this Complaint is to set forth only those facts necessary
to establish probable cause to arrest, I have not described all the relevant facts and
circumstances of which I am aware.

forth below from my participation in the investigation; my review of the investigative file; my communication with witnesses and other law enforcement officers; my review of reports of other law enforcement officers involved in the investigation; and my review of other records associated with the investigation.

2.      The FBI and the New York City Department of Investigation ("DOI") have been conducting an investigation into allegations of fraudulent billing practices in connection with the New York State Early Intervention Program (the "EIP"). The EIP is a New York State program that provides remedial services to developmentally delayed children from birth to age three. Such services may include physical, occupational, and speech therapy; special instruction; and social work services. These services are provided by individual therapists who are either subcontractors or employees of agencies that hold EIP contracts with the New York State Department of Health ("NYS DOH"). NYC DOHMH administers the EIP in New York City and conducts audit, quality assurance, and compliance oversight of the EIP, under the ultimate oversight of NYS DOH.

3.      In order to receive payment for an EIP therapy session, a therapist must provide a written report, known as a session note, documenting his or her session with a child. Sessions generally occur in half-hour or one-hour increments. These session notes detail the date, time and place of the session as well as some details of the therapy given and the child's progress in response to the treatment. Session notes must be signed by the therapist and the parent or guardian of the child immediately after the EIP therapy session ends.

4.      EIP therapists based in New York City are paid for their services through EIP agencies which are, in turn, reimbursed by either: (i) Medicaid; (ii) the NYC DOHMH (through an escrow account managed by New York State); or (iii) private insurance companies.

4

Between 2012 and 2018, NYC DOHMH received at least $10,000 in federal funds each calendar year.[2]

     5.     As set forth below, the investigation to date has revealed that the defendants, all EIP therapists, submitted numerous fraudulent session notes and accompanying invoices for non-existent EIP sessions that purportedly occurred in the Eastern District of New York and elsewhere.

I.    KADERRAH DOYLE

     6.     Between approximately November 2014 and May 2017, KADERRAH DOYLE, an EIP therapist, submitted fraudulent session notes and invoices.   In return, DOYLE received payment for at least 1,000 non-existent EIP sessions purportedly occurring in the Eastern District of New York and elsewhere, resulting in the improper disbursement of more than $29,000 in Medicaid funds and more than $71,000 in NYC DOHMH funds.   For example:

     a.     Law enforcement agents obtained historical location data[3] for DOYLE's cellular telephone, which was identified as DOYLE's cellular telephone based on, among other things, EIP employment records.   Law enforcement officers compared the historical location

---

[2] The vast majority of reimbursements for EIP therapists do not come from private insurance companies, but instead come from either Medicaid or the NYC DOHMH. For example, in 2017, less than two percent of the total reimbursements for EIP therapists came from private insurance companies.

[3] In each instance herein where reference is made to historical location data that law enforcement agents obtained for cellular telephones, the data was obtained via a judicially authorized search warrant.

data[4] associated with DOYLE's telephone to location information contained in the EIP session notes submitted by DOYLE. Based on this review, agents determined that on more than 500 occasions, DOYLE was not present in the vicinity of the EIP therapy session location at the time that the session purportedly occurred.

    b.  Law enforcement officers also reviewed telephone toll records for DOYLE's cellular telephone and determined that on at least 350 occasions DOYLE was using her cellular telephone during at least a quarter of the time period that she claimed to be performing an EIP therapy session. According to NYC DOHMH officials, EIP therapists cannot treat a child while using a telephone, because EIP therapists must monitor, interact with, and take notes about the child throughout the entire session.

    c.  Law enforcement officers also interviewed the parents, guardians, teachers and daycare providers of children to whom DOYLE claimed to provide EIP therapy sessions. Based on these interviews, law enforcement officers identified at least 150 occasions in which DOYLE claimed to perform an EIP therapy session, but which the parent, guardian, teacher or daycare provider stated never actually occurred. This included numerous occasions when the parent, guardian, teacher or daycare provider stated that their signature on the fraudulent session note submitted by DOYLE was a forgery.

---

    [4] Specifically, law enforcement agents obtained historical cell-site data for DOYLE's cellular telephone. Based on my training and experience, I know that historical cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from a given cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected at a given point in time. Historical cell-site data thus can establish the general geographic location of a cellular telephone at a given point in time.

6

d.     Additionally, at all times relevant to the investigation, DOYLE was employed as a full-time teacher with the New York City Department of Education ("DOE"). Law enforcement officers reviewed DOE attendance records and determined that, on at least 60 occasions, DOYLE submitted a fraudulent EIP invoice for a session that purportedly occurred during a time period when, according to DOE attendance records, DOYLE was at work.

e.     Law enforcement officers also reviewed travel records for several airlines and determined that, on at least 55 occasions, DOYLE submitted fraudulent EIP invoices for therapy sessions that purportedly occurred when DOYLE was either outside of New York State or in transit.

f.     Finally, law enforcement officers also identified numerous occasions in which DOYLE submitted two fraudulent EIP invoices in which DOYLE claimed to be providing EIP therapy sessions for two different children at two different locations at the same time.

II.     CARA STEINBERG

7.     Between approximately July 2015 and June 2017, CARA STEINBERG, an EIP therapist, submitted fraudulent session notes and invoices and received payment for more than 1,000 non-existent EIP sessions purportedly occurring in the Eastern District of New York and elsewhere.   These false claims resulted in the improper disbursement of more than $24,000 in Medicaid funds and more than $85,000 in NYC DOHMH funds.   For example:

a.     Law enforcement officers reviewed telephone toll records for STEINBERG's cellular telephone, which they identified as STEINBERG's cellular telephone

based on, among other things, EIP employment records, and determined that on at least 260 occasions STEINBERG was using her cellular telephone during at least a quarter of the time period that she claimed to be performing an EIP therapy session.

      b.    Law enforcement officers also reviewed telephone toll records for STEINBERG's cellular telephone and found that, on many occasions, those records identified the geographic region where STEINBERG was located at the time of a telephone contact. On at least 250 occasions STEINBERG submitted a fraudulent EIP invoice for a purported EIP therapy session when the telephone toll records reflected that STEINBERG was not in the geographic region of the EIP therapy session at the time she claimed the EIP therapy session took place.

      c.    Additionally, on numerous occasions STEINBERG claimed in her EIP session notes and invoices to have performed EIP therapy sessions at daycare providers. Law enforcement officers reviewed attendance records at these daycare providers and identified at least 200 occasions in which STEINBERG claimed to perform an EIP therapy session at a daycare provider at a time when the attendance records reflected that the child purportedly receiving the EIP therapy was not present at the daycare or the daycare was closed at the time the session was claimed to occur.

      d.    Law enforcement officers also interviewed the parents, guardians, teachers and daycare providers of children to whom STEINBERG claimed to provide EIP therapy sessions. On at least 220 occasions, STEINBERG claimed to perform an EIP therapy session and submitted an EIP session note containing a signature that the parent, guardian, teacher or daycare provider stated was a forgery or for a session that the parent, guardian, teacher or daycare provider stated did not occur. In addition, law enforcement officers also

reviewed text message correspondence between STEINBERG and certain parents, guardians, teachers and daycare providers and identified at least 80 occasions in which STEINBERG submitted an invoice for an EIP therapy session that never occurred, as reflected in the text message correspondence.

   e.  Law enforcement officers also identified instances in which STEINBERG submitted invoices for therapy sessions performed under a separate program, the DOE's Committee on Preschool Special Education ("CPSE") program.[5] Law enforcement officers reviewed STEINBERG's invoices for the CPSE program and determined that on at least 100 occasions STEINBERG submitted an invoice for an EIP therapy session purportedly occurring at one location for one child and an invoice for a CPSE therapy session purportedly occurring at the same time as the EIP therapy session, but at a different location for a different child.

   f.  Finally, law enforcement officers reviewed historical location data for STEINBERG's cellular telephone. Law enforcement officers compared the historical location data to location information contained in the EIP session notes submitted by STEINBERG and determined that STEINBERG, on numerous occasions, was not present in the vicinity of the EIP therapy session location at the time of the purported EIP therapy session.

III.  MARINA GOLFO

   8.  During the course of this investigation, law enforcement officers determined that MARINA GOLFO, an EIP therapist, had submitted numerous fraudulent

---

[5] Like the EIP, the CPSE program provides interventionist therapy sessions to children that may include speech therapy, physical therapy and special instruction. Although the EIP provides services for children from birth to three years old, the CPSE program provides services for children from three years old to five years old.

session notes and invoices for non-existent EIP sessions purportedly occurring in the Eastern District of New York and elsewhere. Specifically, law enforcement officers determined that, between approximately April 2015 and February 2018, GOLFO submitted fraudulent session notes and invoices and received payment for more than 1,500 non-existent EIP sessions, resulting in the improper disbursement of more than $10,000 in Medicaid funds and more than $146,000 in NYC DOHMH funds. For example:

      a.    Law enforcement officers reviewed telephone toll records for GOLFO's cellular telephone, which they identified as GOLFO's cellular telephone based on, among other things, EIP employment records, and determined that on at least 800 occasions GOLFO was using her cellular telephone during at least a quarter of the time period that she claimed to be performing an EIP therapy session.

      b.    Law enforcement officers obtained historical location data for GOLFO's cellular telephone. Law enforcement officers compared the historical location data to location information contained in the EIP session notes submitted by GOLFO and determined that GOLFO, on more than 500 occasions, was not present in the vicinity of the EIP therapy session location at the time of the purported EIP therapy session.

      c.    Law enforcement officers also reviewed toll records for GOLFO's cellular telephone and found that, on many occasions, those records identified the geographic region where GOLFO was located at the time of a telephone contact. On at least 175 occasions, GOLFO submitted a fraudulent EIP invoice for a purported EIP therapy session when the toll records reflected that GOLFO was not in the geographic region of the EIP therapy session at the time she claimed the session took place.

d.      Law enforcement officers also obtained license plate recognition ("LPR") records for a vehicle registered to GOLFO.  Law enforcement officers compared LPR records to the EIP invoices submitted by GOLFO and determined that on at least 50 occasions GOLFO submitted an invoice for an EIP therapy session when LPR records reflected that her vehicle was not in the vicinity of the EIP therapy session location at the time of the purported session.

e.      Law enforcement officers also interviewed the parents, guardians, teachers and daycare providers of children to whom GOLFO claimed to provide EIP therapy sessions.  Law enforcement officers identified at least 60 occasions in which GOLFO claimed to perform an EIP therapy session, but which the parent, guardian, teacher or daycare provider stated did not occur as billed, including numerous occasions when the parent, guardian, teacher or daycare provider stated that their signature on the session note submitted by GOLFO for the EIP therapy session was, in fact, a forgery.

IV.   EGO ONAGA

9.      During the course of this investigation, law enforcement officers determined that EGO ONAGA, an EIP therapist, had submitted numerous fraudulent session notes and invoices for non-existent EIP sessions purportedly occurring in the Eastern District of New York and elsewhere.  Between approximately April 2014 and April 2018, ONAGA submitted fraudulent session notes and invoices and received payment for more than 600 non-existent EIP sessions, resulting in the improper disbursement of more than $19,000 in Medicaid funds and more than $40,000 in NYC DOHMH funds.  For example:

a.      Law enforcement obtained judicial authorization to place a GPS tracking device on a vehicle registered to ONAGA.  Pursuant to a judicially authorized warrant, law

enforcement officers installed the device on or about March 13, 2018 and ceased using the device on or about April 27, 2018.    Law enforcement officers determined that on approximately 330 occasions during that time period ONAGA submitted a fraudulent session note and invoice for an EIP therapy session when the GPS tracking device reflected that ONAGA was not the vicinity of the EIP therapy session location at the time she claimed the session occurred.

        b.     Law enforcement officers also reviewed travel records for several airlines and determined that, on at least 170 occasions, ONAGA submitted fraudulent EIP invoices for therapy sessions that purportedly occurred when ONAGA was, in fact, either outside of New York or in transit.

        c.     Additionally, during the course of the time period relevant to this investigation, ONAGA was employed full-time as a DOE teacher.    Law enforcement officers reviewed DOE attendance records and overtime records and determined that, on at least 90 occasions, ONAGA submitted a fraudulent EIP invoice for a session that purportedly occurred during a time period when, according to DOE attendance records, ONAGA was at work.

## V.    LYUBOV BEYLINA

        10.     During the course of this investigation, law enforcement officers determined that LYUBOV BEYLINA, an EIP therapist, had submitted numerous fraudulent session notes and invoices for non-existent EIP sessions purportedly occurring in the Eastern District of New York and elsewhere.    Specifically, law enforcement officers determined that, between approximately August 2012 and January 2017, BEYLINA submitted fraudulent session notes and invoices and received payment for more than 600 non-existent EIP sessions,

12

resulting in the improper disbursement of more than $24,000 in Medicaid funds and more than $17,000 in NYC DOHMH funds.  For example:

      a.     Law enforcement officers reviewed toll records for BEYLINA's cellular telephone, which they identified as BEYLINA's cellular telephone based on, among other things, EIP employment records, and determined that on at least 300 occasions BEYLINA was using her cellular telephone during at least a quarter of the time period that she claimed to be performing an EIP therapy session.

      b.     Law enforcement officers also interviewed the parents, guardians, teachers and daycare providers of children to whom BEYLINA claimed to provide EIP therapy sessions.  Law enforcement officers identified at least 100 occasions in which BEYLINA claimed to perform an EIP therapy session and submitted an EIP session note containing a signature that the parent, guardian, teacher or daycare provider stated was a forgery or for a session that did not occur.  In addition, law enforcement officers also reviewed text message correspondence between BEYLINA and certain parents, guardians, teachers and daycare providers and identified at least 180 occasions in which BEYLINA submitted an invoice for an EIP therapy session that, as reflected in the text message correspondence, never occurred.

      c.     Law enforcement officers also reviewed travel records for several airlines and determined that, on at least 80 occasions, BEYLINA submitted fraudulent EIP invoices for therapy sessions that purportedly occurred when BEYLINA was, in fact, either outside of New York or in air transit.  For example, BEYLINA submitted 51 invoices for EIP therapy sessions purportedly occurring between June 28, 2016 and July 5, 2016, when BEYLINA was, in fact, in the Dominican Republic.  A photograph of BEYLINA in the

13

Dominican Republic during the time period she claimed she was in New York performing EIP therapy sessions is attached hereto as Exhibit A.

        d.     Finally, law enforcement officers reviewed historical location data for BEYLINA's cellular telephone.  Law enforcement officers compared the historical location data to the EIP session notes submitted by BEYLINA and determined that BEYLINA, on numerous occasions, was not present in the vicinity of the EIP therapy session location at the time of the purported EIP therapy session.

## VI.   DANIELLE SCOPINICH

        11.    During the course of this investigation, law enforcement officers determined that DANIELLE SCOPINICH, an EIP therapist, had submitted numerous fraudulent session notes and invoices for non-existent EIP sessions purportedly occurring in the Eastern District of New York and elsewhere.  Between approximately January 2015 and July 2017, SCOPINICH submitted fraudulent session notes and invoices and received payment for more than 500 non-existent EIP sessions, resulting in the improper disbursement of more than $15,000 in Medicaid funds and more than $15,000 in NYC DOHMH funds.  For example:

        a.     Law enforcement officers obtained historical location data SCOPINICH's cellular telephone, which they identified as SCOPINICH's cellular telephone based on, among other things, EIP employment records,.  Law enforcement officers compared this historical location data to the EIP session notes submitted by SCOPINICH and determined that SCOPINICH, on more than 350 occasions, was not present in the vicinity of the EIP therapy session location at the time of the purported EIP therapy session.

b.      Law enforcement officers also learned, during the course of this investigation, that SCOPINICH was also submitting invoices for therapy sessions performed under the DOE's CPSE program.   Law enforcement officers reviewed SCOPINICH's invoices for the CPSE program and determined that on at least 48 occasions SCOPINICH submitted an invoice for an EIP therapy session purportedly occurring at one location for one child and an invoice for a CPSE therapy session purportedly occurring at the same time as the EIP therapy session, but at a different location for a different child.

c.      Law enforcement officers also interviewed the parents, guardians, teachers and daycare providers of children to whom SCOPINICH claimed to provide EIP therapy sessions.   Law enforcement officers identified at least 74 occasions in which SCOPINICH claimed to perform an EIP therapy session and submitted an EIP session note containing a signature that the parent, guardian, teacher or daycare provider stated was a forgery or for a session that did not occur.

d.      Law enforcement officers also found that SCOPINICH repeatedly claimed in her EIP session notes and invoices to have performed EIP therapy sessions at daycare providers.   Law enforcement officers reviewed sign-in sheet records at these daycare providers and identified at least 50 occasions in which SCOPINICH claimed to perform an EIP therapy session at a daycare provider at a time when the sign-in sheet records reflected that SCOPINICH was not present at the daycare.

e.      Law enforcement officers reviewed toll records for SCOPINICH's cellular telephone and determined that on numerous occasions SCOPINICH was using her cellular telephone during at least a quarter of the time period that she claimed to be performing an EIP therapy session.

VII.   ENOCK MENSAH

12.   During the course of this investigation, law enforcement officers determined that ENOCK MENSAH, an EIP therapist, had submitted numerous fraudulent session notes and invoices for non-existent EIP sessions purportedly occurring in the Eastern District of New York and elsewhere.   Between approximately August 2013 and August 2017, MENSAH submitted fraudulent session notes and invoices and received payment for more than 1,200 non-existent EIP sessions, resulting in the improper disbursement of more than $105,000 in Medicaid funds and more than $20,000 in NYC DOHMH funds.   For example:

a.   Law enforcement officers obtained LPR records for a vehicle registered to MENSAH.   Law enforcement officers compared LPR records to the EIP invoices submitted by MENSAH.   On at least 1,000 occasions MENSAH submitted an invoice for an EIP therapy session when LPR records reflected that his vehicle was not in the vicinity of the EIP therapy session location at the time of the purported session.

b.   Law enforcement officers reviewed toll records for MENSAH's cellular telephone, which they identified as MENSAH's cellular telephone based on, among other things, EIP employment records, and determined that on at least 200 occasions MENSAH was using his cellular telephone during at least a quarter of the time period that he claimed to be performing an EIP therapy session.

c.   Law enforcement officers also interviewed the parents, guardians, teachers and daycare providers of children to whom MENSAH claimed to provide EIP therapy sessions.   Law enforcement officers identified at least 90 occasions in which MENSAH claimed to perform an EIP therapy session and submitted an EIP session note containing a

signature that the parent, guardian, teacher or daycare provider stated was a forgery or for a session that did not occur.

VIII.    PATRICIA HAKIM

13.    During the course of this investigation, law enforcement officers determined that PATRICIA HAKIM, an EIP therapist, had submitted numerous fraudulent session notes and invoices for non-existent EIP sessions purportedly occurring in the Eastern District of New York and elsewhere.    Specifically, law enforcement officers determined that, between approximately March 2015 and October 2017, HAKIM submitted fraudulent session notes and invoices and received payment for more than 300 non-existent EIP sessions, resulting in the improper disbursement of more than $3,000 in Medicaid funds and more than $18,000 in NYC DOHMH funds.   For example:

a.    Law enforcement officers reviewed toll records for HAKIM's cellular telephone, which they identified as HAKIM's cellular telephone based on, among other things, EIP employment records, and determined that on at least 140 occasions HAKIM was using her cellular telephone during at least a quarter of the time period that she claimed to be performing an EIP therapy session.

b.    Law enforcement officers also reviewed telephone toll records for HAKIM's cellular telephone and found that, on many occasions, those records identified the geographic region where HAKIM was located at the time of a telephone contact.   On at least 60 occasions HAKIM submitted a fraudulent EIP invoice for a purported EIP therapy session when the telephone toll records reflected that HAKIM was not in the geographic region of the EIP therapy session at the time she claimed the EIP therapy session took place.

c.     Law enforcement officers also obtained bank transaction records for accounts in HAKIM's name and identified at least 50 occasions in which HAKIM engaged in banking transactions out of New York State on the same dates that HAKIM claimed to be performing EIP therapy sessions in New York State.

d.     Law enforcement officers also interviewed the parents, guardians, teachers and daycare providers of children to whom HAKIM claimed to provide EIP therapy sessions.   Law enforcement officers identified at least 30 occasions in which HAKIM claimed to perform an EIP therapy session and submitted an EIP session note containing a signature that the parent, guardian, teacher or daycare provider stated was a forgery or for a session that did not occur.

e.     Law enforcement officers also learned, during the course of this investigation, that HAKIM was also submitting invoices for therapy sessions performed under the DOE's CPSE program.   Law enforcement officers reviewed HAKIM's invoices for the CPSE program and determined that on at least 30 occasions HAKIM submitted an invoice for an EIP therapy session purportedly occurring at one location for one child and an invoice for a CPSE therapy session purportedly occurring at the same time as the EIP therapy session but at a different location for a different child.

f.     Law enforcement officers obtained LPR records for a vehicle registered to HAKIM.   Law enforcement officers compared LPR records to the EIP invoices submitted by HAKIM and determined that on at least 10 occasions HAKIM submitted an invoice for an EIP therapy session when LPR records reflected that her vehicle was not in the vicinity of the EIP therapy session location at the time of the purported session.

g.     Law enforcement officers also reviewed travel records for several airlines and determined that, on numerous occasions, HAKIM submitted fraudulent EIP invoices for therapy sessions that purportedly occurred when HAKIM was, in fact, either outside of New York or in air transit, including when HAKIM was traveling abroad in Ireland and Spain.

IX.     REQUEST FOR SEALING

14.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application itself.   I believe that sealing these documents is necessary to preserve the integrity of this ongoing criminal investigation.   Based upon my training and experience, I have learned that criminals actively search online for criminal affidavits and arrest warrants via the Internet, and disseminate them to other criminals as they deem appropriate.   Premature disclosure of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

19

WHEREFORE, your deponent respectfully requests that the defendants KADERRAH DOYLE, CARA STEINBERG, MARINA GOLFO, EGO ONAGA, LYUBOV BELINA, DANIELLE SCOPINICH, ENOCK MENSAH and PATRICIA HAKIM be dealt with according to law.

MELISSA GALICIA
Special Agent, Federal Bureau of Investigation

Sworn to before me this
2 day of October, 2018

THE HONORABLE VERA M. SCANLON
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

# Exhibit A

